## WEISS v. SMITH.
### Civ. No. 3366.

United States District Court
D. Connecticut.
Jan. 15, 1952.

See also 103 F.Supp. 736.

William H. Timbers, Cummings & Lockwood, Morgan P. Ames, Stamford, Conn., for plaintiff.

Hyman R. Friedman, New York City, Joseph K. Sherman, Stamford, Conn., for defendant.

SMITH, District Judge.

This is an action for specific performance of defendant's contract granting plaintiff an option to purchase one-third of defendant's 50% stock interest in two corporations: Biggs Boiler Works Company, and Central Management.

Biggs and Central Management were, in November, 1950, in financial difficulties. In this situation, Allied Commonwealth Corporation, a New Jersey corporation, was interested in taking over the financing of Biggs. Plaintiff Weiss and one Garfinkel controlled 75% of Allied Commonwealth and Dorison, its president, 25%.

Weiss and Dorison came to Cleveland and, on November 6, 1950, arrived at a final agreement with Krizanek and Smith on terms for financing Biggs' operations. The agreement was in four parts: (1) a written agreement on financing of receivables; (2) a written agreement on financing of inventory; (3) a written agreement granting the Allied interests an option to purchase one-third of the stock held by Krizanek and Smith at the price they had paid for it, $2,600, to be paid $100 at the giving of the option, $2,500 at its exercise; (4) an oral agreement that Krizanek, Smith and Allied each share equally in Biggs' profits and that "consultants' fees" be paid the Allied interests by Biggs at the rate of $1,000 a month, equal to the salary to be drawn by Smith and by Krizanek, and that two of four directors be Allied's nominees.

Allied advanced $65,000 immediately to clean up pressing bills and pay off the old factor, and continued to advance funds against assignment of accounts receivable and against inventory. The interest rate was approximately 18%, with an agreement to reduce it to 15% when the amount outstanding reached a certain figure. The option agreement was delivered to Allied only after the $65,000 was advanced.

There were squabbles and several changes in arrangements caused by a requirement for Allied's countersigning of Biggs' checks. There was also a dispute in January, 1951, over the assignment of a receivable from West Virginia Pulp and Paper Company on which a down payment had already been made to Biggs. Biggs, on the other hand, complained because the amounts advanced were lower than the percentages agreed to be advanced by Allied.

There was less than complete trust of the other party exhibited by each side, but, on the whole, substantial performance or at least performance reasonably acceptable to both was had until late March, 1951. At that point, Allied had made substantial advances and Biggs' condition had materially improved. The monthly losses were still being incurred, but had lessened. A large backlog of orders was on the books. Prospects for future profits, and for meeting the terms of the mortgage-extension agreement were brighter.

At this point, on March 22, 1951, Allied, from which Dorison had meanwhile departed after warning Smith of trouble ahead, shut down on financing for Biggs and required drastic economies, in large part at the expense of Smith's receipts from Biggs, as well as the creation of a definite limiting ratio between loans for receivables and loans for inventory, and investment by Krizanek and Smith in Biggs, as the price of renewal of the financing.

Frantic but unsuccessful efforts were made by Smith to find other financing, terminated by his removal as president and director of Biggs.

The removal of Smith was attempted to be accomplished first through a voting trust which had been set up in late November, 1950, by Krizanek and Smith, constituting Steadman, Biggs' attorney, Krizanek, and Smith trustees to vote all the stock. Steadman and Krizanek voted all the stock, including Smith's, to remove Smith, close the New York office, and stop Smith's pay and expenses. The Delaware court, however, invalidated the action. Meanwhile, the board of directors, by the votes of Krizanek and Allied's nominees, removed Smith as an officer of the corporations and

stopped his pay and expenses and the support of Smith's New York office.

Krizanek capitulated to Weiss' demands, cooperating in the removal of Smith and investing some $15,000 in Biggs, as did one Martin, who became a vice president of Biggs.

Smith had earlier indicated a refusal to invest more money in Biggs, but was not even informed of the new demands of Allied before his removal.

The financing by Allied was resumed, advances outstanding at the time of trial totaling some $500,000. The profit picture continued to improve, the requirement of $73,000 profit by July, 1951, being met, and profits at the time of trial running at approximately $60,000 a month before taxes but after the financing and "consultants' fees" to the Allied interests, and Krizanek's salary and expenses.

During the disagreement over the stopping of the financing, Krizanek, in Biggs' name, on March 30, 1951, notified Allied that because of multiple breaches on Allied's part, the agreements were rescinded, including the option agreement. Later, however, on April 11, 1951, after the resumption of the financing, Krizanek, on behalf of Biggs, reaffirmed the agreements, including the option agreement, and when Garfinkel, as nominee of the Allied interests, on June 6, 1951, asserted the option on one-third of Krizanek's stock in Biggs, and tendered $1,250. Krizanek honored the agreement and assigned the stock to Garfinkel.

Weiss tendered $1,250 to Smith and demanded transfer of one-third of Smith's stock to him under the option. Smith refused, claiming that the option agreement was no longer in existence. Thereupon Weiss instituted this action for specific performance, in which a temporary injunction issued after hearing, restraining Smith from disposing of the one-third of his stock involved, pending the outcome of this action but not from voting it.

■ It is safe to say that there were no serious defaults on either side prior to March, 1951, and that those which did exist in that period were waived by the continued operations under the agreement up to the cessation of financing.

Each side attempts to magnify the faults of the other. Garfinkel's earlier testimony on the defaults of Biggs was much watered down on the main trial, leaving nothing but the West Virginia Pulp and Paper situation and the proportionate relationship of inventory and receivable loans. The West Virginia Pulp situation was not provided for specifically in the original agreement, and was satisfactorily adjusted before the cessation of financing in any case. The imbalance between inventory and receivable loans was not provided against in the original agreement. Weiss, on the preliminary hearing, also gave the impression that Smith had drawn out his $2,000 loan to Biggs, after its payment had been refused, by padding his expense account, but failed to establish any such padding on the trial and obviously had intentionally given a wrong impression on this matter.

■ The cessation of financing was, therefore, wrongful. The breach as to Biggs, however, was waived by Biggs by the resumption of operation under the financing agreement as modified in practice by the changes demanded by Allied.

Smith never attempted to give Allied or Weiss notice of any rescission of the option agreement on his part prior to Weiss' demand for performance.

By that time he had, at Weiss' instigation, been discharged as a *salaried* officer in violation of the unwritten understanding that profits would, by salaries or otherwise, be paid to Krizanek, Smith and Allied's interests equally.

■ The remedy at law is inadequate. Control of the corporation, even if not pleaded, is obviously involved. No other shares of stock are available on the market. And ownership of a minority of stock in Biggs without some binding alliance, insuring control, or some court protection, offers no hope of participation in its earnings.

■ The defendant lays great stress on the point that specific performance should not be decreed when there is no mutuality of remedy. That this is a correct statement of the general rule cannot be seriously questioned, but what the defendant fails to

realize, or at least to point out to the Court, is that many courts refuse to let the original lack of mutuality deter them from granting specific performance when the party who had no enforceable obligations subsequently performed his otherwise illusory promises.

The obligations which the defendant claims were illusory were those arising out of the two financing agreements. The argument starts with the assumption that the option agreement was conditioned on, and was part and parcel of, the financing agreements. It then proceeds to attempt to prove by the testimony of the witnesses at both trials, and by the financing agreements themselves, that Allied had absolute discretion in the amounts it would lend Biggs, even to the point where it could refuse to lend any money at all. (Pp. 24–26, Defendant's Memorandum of Law; Par. 9 of the Inventory Agreement; Par. 3 of the Accounts Receivable Agreement.) This latter point is entitled to serious consideration by the Court, though it is somewhat weakened by the clause in the inventory agreement whereby Biggs constituted Allied its sole and exclusive factor, a situation analogous to the requirements contracts cases where such a clause has been interpreted by many courts to mean that the seller agrees to furnish the reasonable needs of the buyer for the particular commodity.

But whatever may have been the discretionary extent of Allied's obligations, there seems little doubt that it did, in fact, advance Biggs all that it needed, or at least all that was contemplated by the parties when the contracts were signed. This performance, then, would cure the defect of lack of mutuality and would place the plaintiff in a position where he could validly assert his rights for specific performance.

Our next question is whether the four agreements, three written and one oral, are integral parts of one complete contract, and, if so, whether the breach of the financing agreement voids the option agreement or whether the breach of the division of profits agreement by firing Smith voids Smith's obligation under the option agreement.

The four agreements are part of a single scheme for refinancing and dealing with the income of Biggs.

It is true that in form the three written agreements are each complete in themselves, and indeed the evidence preponderates that Smith declined to have inserted in the option agreement a condition of continued financing, but it seems obvious that all the parties considered all the agreements together as means for refinancing Biggs, overcoming its financial difficulties and dividing the resultant profits. Participation by Allied in profits beyond the "consultants' fees" by stock ownership was, it is true, left optional so that Allied could determine, after a period, whether the stock would be worth more than the $2,600 option price for which it could acquire it.

Yet it might well be that the parties did not intend to make each part of the scheme dependent upon all the others.

Smith chose not to make the option agreement conditional on continued financing.

He was advised to, and did, hold up delivery of the option agreement until the first $65,000 financing was provided. He felt that once in, Allied would have to stay in for some time.

These are rather strong indications that he expected the option to be exercisable at once, and that it was the initial financing, rather than continuation, which was to be consideration for the option agreement.

We can hardly say then that the oral agreements were part of the consideration. They were part of the whole scheme of future handling of Biggs and its profits. But if Smith deliberately left out these considerations from the written option agreement, their later failure should not defeat the option agreement. Even if that is so, however, it is questionable whether equity should require its enforcement in favor of Weiss when Weiss has violated the separate (but related to the same general scheme) contract re salaries, etc.

The present situation is one of stalemate. Some court action will be necessary to resolve it. It should be possible so to tailor relief here as to provide a workable basis.

for the future relations of the parties. Weiss is entitled to a free hand in the use of the stock optioned to him so long as Smith is treated fairly. Weiss' past actions indicate the need for some assurance that Smith will be so treated, however. Either payments should be made equally to all three interests, Krizanek, Smith and Allied, by dividend or otherwise as the state law may permit as the only distribution of profits, or, if the company's condition makes inadvisable payments to Smith, no payments should be made to Allied's interests and none to Krizanek above a reasonable manager's salary. Of course, there may be some danger that Allied and Krizanek will endeavor to draw money out of Biggs without sharing with Smith by rigging the interest rates on Allied's loans, but Krizanek's self-interest may well be expected to prevent this, since his bargaining position with Allied has greatly improved through Biggs' success and Allied's present heavy involvement. Outside financing might well be possible now, removing Weiss' gun from Krizanek's head and enabling the three-way "partnership" to function effectively and fairly. It appears to be worth an attempt. The specific performance prayed for may be decreed, conditioned on the plaintiff's furnishing a sufficient undertaking with surety or deposit of the stock under an escrow agreement to ensure the carrying out of the profit-sharing agreement as described above.

Form of judgment may be submitted by stipulation or on notice.